### TOYO KISEN KABUSHIKI KAISHA v. WILLITS & CO., Inc., et al.

(Circuit Court of Appeals, Ninth Circuit. February 14, 1927.)

No. 4906.

**1. Shipping ⟨⟩121(2)—Ship held liable for damage to cargo from seawater leaking through open boltholes, though no unusual weather was encountered.**

Owner *held* liable for damage to cargo from seawater which entered through two boltholes through the shell of the ship, from which the bolts had worked loose and dropped out, though the ship encountered no unusually stormy weather, and all other similar bolts were found tight and in good condition.

**2. Shipping ⟨⟩132(4)—Burden is on ship to show that it was without fault for damage to cargo from seawater which should have been guarded against.**

Where cargo is damaged by entry of water through apertures which should be protected, the burden is on the ship to excuse the fault and make a clear case that it fully discharged the duty it undertook to perform toward the shipper.

**3. Shipping ⟨⟩140(1)—Limitation of liability clause in bill of lading is not binding on shipper, where he is given no special rate because of it.**

Where a special rate is not allowed a shipper by reason of a concession on his part that his recovery in case of damage should be limited, a limiting clause in the bill of lading is not binding on him.

Appeal from the District Court of the United States for the Southern Division of the Northern District of California; Frank H. Kerrigan, Judge.

Suit in admiralty by Willits & Co., Inc., and others, against the Toyo Kisen Kabushiki Kaisha. Decree for libelants, and respondent appeals. Affirmed.

Thomas B. Dozier, C. F. Kimball, Thomas B. Dozier, Jr., and Dozier, Kimball & Dozier, all of San Francisco, Cal., for appellant.

S. Hasket Derby, Joseph C. Sharp, and Derby, Single & Sharp, all of San Francisco, Cal., for appellees.

Before GILBERT and RUDKIN, Circuit Judges, and JAMES, District Judge.

JAMES, District Judge. Decree in this case was for libelants, and the respondent appealed. The proceeding was in personam.

The appellees were the consignees of merchandise which formed a part of the cargo of a ship owned by appellant which arrived in the port of San Francisco in May, 1924. It was found upon discharge of the cargo that the merchandise of appellees had been damaged by seawater. As a secondary cause of damage, it appeared that a lot of arsenic acid belonging to the appellee Pacific Orient Company had, after being wet by the seawater, contributed to contaminate and injure other of the merchandise for which °libel was brought. As to the cause and character of the damage, no dispute arises in the case. It was claimed for the ship that it was seaworthy in all respects, and that no reasonable precaution had been neglected to keep it so during the voyage.

[1] Not only was it undisputed that seawater produced the damage, but it was unquestioned that the water gained ingress through two holes in the side of the ship, which were there placed to receive bolts used to make fast to the steel sides, or "skin," of the ship certain baffle plates. These plates were not a part of the protective sides of the ship, but were raised plates covering apertures through which waste water from toilet rooms was discharged. Their purpose was to turn the course of such water and prevent it from being projected outward. These plates were located at different heights above the water line. The bolts fastening the plates to the ship were about four inches in length, and there were eight in number to each plate. They were threaded, as were also the holes in the steel shell of the ship through which they were screwed.

The ship had been dry-docked at Yokohama and had there been inspected. According to the testimony of a Japanese ship officer, the baffle plates had been examined and a hose played over them to see that no leaks were present. When the ship arrived in San Francisco, one bolt from each of two plates was missing. The ship stopped at Honolulu and there discharged cargo, which was dry and uninjured by water. The captain in charge on the voyage testified that some rough weather was encountered between Yokohama and Honolulu, and that on the voyage between Honolulu and San Francisco there was more rough weather, causing the ship to roll heavily, and some water came on board.

There was no evidence that the stormy weather occurring during two or three days of the trip between Honolulu and San Francisco was of an unusual character, or other than was to be expected in those waters.

[2] It will not be necessary to detail the evidence with great particularity. Conceding that under storm stress the baffle plates might, in connection with the shell of the ship, move or work loose because of the strain, it appears here that all of the bolts that remained in each baffle plate were intact and in good order. Upon the theory of reasonable probabilities, it is logical to conclude that the bolts which left their fastenings were either of improper size when placed in position or were not tightly secured. Where a ship's cargo is damaged by the entry of water through apertures which should be protected and guarded, the burden is upon the ship to excuse the fault, and make a clear case that it has fully discharged the duty it undertook to perform toward the shipper. The law is settled in that regard beyond debate. See The Medea, 179 F. 781, decided by this court, in which authorities are collected. It was not shown that it was an ordinary happening for such bolts to work out under any condition of weather. A witness for respondent, who had had 30 years' experience at sea, had never known of such a happening. The condition of the bolts remaining in the plates negatives any claim that a bolt properly placed and of suitable kind would have been sheared off or forced from its position. It is even a matter of some probability that the bolts never were fitted in the holes.

During the voyage between Honolulu and San Francisco the ship's officers found that water had increased in "No. 3 bilge" by four inches. This was stated in behalf of the ship as not to be an unusual condition. It is a fact of some evidentiary significance, however, that the log of the ship under date of May 14, 1924, contained this entry: "Found No. 3 bilge increased 4 inches; send fourth officer in No. 3 hold, but couldn't find the cause, on account of full cargo." The conclusion reached by the District Judge as to the facts is fully sustained by the evidence.

[3] With respect to the merchandise consigned to appellee Willits & Co., Inc., the bill of lading contained a condition expressed in the following words:

" * * * Said company will not become liable for any value exceeding one hundred dollars ($1,000.00) upon each of the above-named packages, unless other valuation is declared and so expressed in this bill of lading."

It will first be noted that the valuation

amount is stated in words as "one hundred dollars" and in figures as "$1,000.00." The value of these goods, as established by the decree, amounted to $4,041.20. If only $100 per package should be allowed to be recovered, the damage would be $1,500. No attempt need be made to reconcile or to construe the valuation condition, and determine whether the intent was to fix the amount of recovery at $100 per package, or $1,000. It was not shown that a special rate was allowed the appellee mentioned in that bill of lading by reason of a concession on his part that his recovery should be limited. Under such facts the limiting clause was not binding on the shipper. See Union Pacific R. R. Co. v. Burke, 255 U. S. 317, 41 S. Ct. 283, 65 L. Ed. 656; Lawrence Leather Co. v. Compagnie Générale Transatlantique (D. C.) 12 F.(2d) 83. In the case above cited (255 U. S. 317, 41 S. Ct. 283, 65 L. Ed. 656) the Supreme Court said:

"This court has consistently held the law to be that it is against public policy to permit a common carrier to limit its common-law liability by contracting for exemption from the consequences of its own negligence or that of its servants ([Hart v. Pennsylvania R. R. Co.] 112 U. S. 331, 338 [5 S. Ct. 151, 28 L. Ed. 717]; [Boston & Maine R. R. v. Piper] 246 U. S. 439, 444 [38 S. Ct. 354, 62 L. Ed. 820, Ann. Cas. 1918E, 469]), and valuation agreements have been sustained only on principles of estoppel and in carefully restricted cases where choice of rates was given—where 'the rate was tied to the release.'"

In the second case above cited, the Leather Company Case, the bill of lading was in substance the same in its condition as to limited valuation as that shown here.

The decree is affirmed.